**IN THE COURT OF APPEALS OF IOWA**

No. 22-0166
Filed August 17, 2022

**IN THE INTEREST OF C.W.,**
**Minor Child,**

**M.B.,**
         Petitioner-Appellee,

**C.S., Father,**
         Respondent-Appellant.
_____

Appeal from the Iowa District Court for Woodbury County, Mark C. Cord III,

District Associate Judge.

A father appeals the private termination of his parental rights to his son.

**AFFIRMED.**

Jessica R. Noll of DeckLaw, LLP, Sioux City, for appellant.

David L. Gill of Baron, Sar, Goodwin, Gill & Lohr, Sioux City, for appellee

mother.

Maxine M. Buckmeier of Maxine M. Buckmeier P.C., Sioux City, self-

represented appellee.

Kelsey Bauerly Langel, Le Mars, attorney and guardian ad litem for minor

child.

Considered by Bower, C.J., and Tabor and Ahlers, JJ.

**TABOR, Judge.**

Three days after giving birth to C.W., his mother, Anna, surrendered custody so that he could be adopted. The legal custodian then petitioned to terminate her parental rights, as well as the rights of C.W.'s putative father, Christopher.[1] Four months later, the district court granted the petition, finding the custodian offered clear and convincing evidence to prove Christopher abandoned C.W. under Iowa Code sections 600A.2(20) and 600A.8(3)(a) (2021). The court also decided that termination was in C.W.'s best interests. Christopher appeals, challenging the abandonment finding. Because the custodian proved that Christopher's actions did not show a commitment to C.W., we affirm the termination order.[2]

## I.       Abandonment Defined

Abandoning a child means rejecting "the duties imposed by the parent-child relationship." Iowa Code § 600A.2(20). A parent is "deemed to have abandoned [a] child" who is less than six months of age

> unless the parent does *all* of the following:
>     (a) Demonstrates a willingness to assume custody of the child rather than merely objecting to the termination of parental rights.
>     (b) Takes prompt action to establish a parental relationship with the child.
>     (c) Demonstrates, through actions, a commitment to the child.

*Id.* § 600A.8(3)(a)(1) (emphasis added).

---

[1] DNA testing in October 2021 confirmed that Christopher was C.W.'s father.
[2] We review termination proceedings under chapter 600A de novo. *In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020). We give weight to the trial court's findings of fact, especially when considering witness credibility, but we are not bound by them. Iowa R. App. P. 6.904(3)(g).

In deciding whether these requirements are met, the court may consider these factors:

> (a) The fitness and ability of the parent in personally assuming custody of the child, including a personal and financial commitment which is timely demonstrated.
> (b) Whether efforts made by the parent in personally assuming custody of the child are substantial enough to evince a settled purpose to personally assume all parental duties.
> (c) With regard to a putative father, whether the putative father publicly acknowledged paternity or held himself out to be the father of the child during the six continuing months immediately prior to the termination proceeding.
> (d) With regard to a putative father, whether the putative father paid a fair and reasonable sum, in accordance with the putative father's means, for medical, hospital, and nursing expenses incurred in connection with the mother's pregnancy or with the birth of the child, or whether the putative father demonstrated emotional support as evidenced by the putative father's conduct toward the mother.
> (e) Any measures taken by the parent to establish legal responsibility for the child.
> (f) Any other factors evincing a commitment to the child.

*Id.* § 600A.8(3)(a)(2).

A parent's subjective intent "unsupported by evidence of acts . . . manifesting such intent" does not prevent a finding of abandonment and the court "may consider the conduct of the putative father toward the child's mother during the pregnancy." *Id.* § 600A.8(3)(c).

## II. Discussion

On appeal, Christopher argues that he was not given the chance to act as C.W.'s father and so he can't have rejected parental duties.[3] A brief history of Christopher's relationship with Anna refutes his argument.

---

[3] C.W.'s guardian ad litem (GAL) filed an appellee's brief supporting termination. The legal guardian and Anna joined the arguments advance by the GAL.

Both Christopher and Anna were on parole when they met in October 2020.[4] He was her drug dealer. They also used methamphetamine together, and Anna started selling drugs for him. When their relationship turned intimate, they moved in together. They stayed in the home of Christopher's mother, along with other family members—all actively used methamphetamine.

Anna learned she was pregnant in December 2020.[5] Anna and Christopher had different reactions to the news. Anna recalled that Christopher was "glad" about the pregnancy, but intended to keep using methamphetamine after the child's birth. For her part, Anna was "upset" about the expected baby because she did not believe that Christopher would be a safe father. Beyond his drug use, Anna described Christopher as "controlling" and having anger issues. In her words, he would "spazz out all the time when he didn't like something . . . he threw a tantrum a lot." She also recalled that he could be physically violent.

Wanting a healthier environment during her pregnancy—in February 2021 Anna asked her parole officer for a violation notice, allowing her to enter a residential facility. Given her limited resources, she believed this was her only way to leave Christopher and get away from methamphetamine use. Before she entered the residential facility, Anna and Christopher attended her first prenatal doctor visit together. Christopher drove her to two other prenatal appointments but did not attend. His anger flared after picking her up from one of those appointments. Anna asked him to grab a pizza for her lunch. But when they

---

[4] Christopher had convictions for third-offense domestic abuse assault and third-offense possession of controlled substances.

[5] Christopher testified he learned of the pregnancy in January 2021.

argued on the drive back to the residential facility, he threw the pizza into the parking lot.

That spring, Christopher's parole officer received reports from the residential facility that he was there yelling obscenities at Anna and the staff. The staff suspected he was under the influence. He also made harassing phone calls to the facility. After that, Anna's intermittent contact with Christopher inevitably would end in an argument. Anna suggested that he should "see a doctor because he was continuously getting angry" and "throwing a fit." She testified he "blacks out sometimes and gets physical." She remembers telling him she "didn't want to be around him at all until he got help from a mental-health specialist."

Adding to his troubles, Christopher was not regularly checking in with his parole officer as required. That situation changed in April, when Christopher called his parole officer, admitted drug use and poor mental health, and promised to seek treatment. But Christopher did not follow through.

Still feeling unsafe around Christopher, Anna told him for a final time in July that he needed to address his mental health before she would consider co-parenting with him. She also suggested giving the baby up for adoption if he did not seek help.

C.W. was born in August 2021 testing positive for methamphetamine. Christopher's name was not on the birth certificate.

Two weeks earlier, Anna had relapsed on methamphetamine. Christopher was in jail. He had been arrested for parole violations after being discovered unresponsive in a parking lot and transported to the hospital. Christopher admitted taking sleeping pills, but insisted it was not a suicide attempt—rather a way to "get

some help." Anna then decided to place the baby for adoption and contacted a private agency. To launch that process, in early September, Anna released C.W. to the legal custody of attorney Maxine Buckmeier. A week later, Buckmeier petitioned to terminate parental rights.

The court set trial for early October. Christopher appeared with counsel, who disclosed that Christopher had fired him.[6] The court informed Christopher, who was no longer in jail, that if he intended to apply for court-appointed counsel, paternity must be established and it was his obligation to pay for DNA testing. When the court asked if he was prepared to go through that process, Christopher responded: "Yeah. I'm not even sure I'm the father. I mean I'm not on the birth certificate. She has slept around before." Christopher later added: "If this baby's mine, I want to fight for him." The court granted Christopher one week to present himself for testing and continued the trial. The court directed Christopher to pay the testing costs to Buckmeier, who would make the arrangements.

But Buckmeier could not book a testing date in Christopher's hometown until mid-November. So, in consultation with his parole officer, she scheduled the paternity test at the nearest available facility—about fifty miles away. The travel distance infuriated Christopher, who called Buckmeier to complain, "drop[ping] the F word a lot and just angry and explosive." Buckmeier observed that Christopher displayed no cooperation or problem-solving skills in dealing with the paternity

---

[6] Counsel told the court that he was trying to explain to Christopher "what he would be up against in this matter," when "he stopped me, and if I may quote—he interrupted me, saying, 'You're' and in gist of decorum I'll say 'f-ing against me; you're fired; I'll just go to court by myself next Thursday' and slammed down the phone."

issue. In her words, "He felt very entitled and demanding and everything had to be on his terms."

After the paternity test confirmed that Christopher was C.W.'s father, the termination trial went forward on two dates in November 2021. After the first day, Christopher moved for visitation with C.W. The court ruled it was without authority in a private termination proceeding to address the visitation motion.

At trial, Anna testified that she supported the termination so that C.W. could be adopted. She stated Christopher had not been financially or emotionally supportive during her pregnancy and she did not believe that he could safely parent a baby because "he did not do what he needed to do before [C.W.] was born." Her safety concerns were bolstered by evidence that Christopher had struggled with methamphetamine addiction for almost two decades and had a long criminal history.

But the record also revealed recent progress on his part. Christopher's parole officer testified Christopher was released from jail and entered a work-release residential facility in late September.[7] He reported that Christopher had submitted only negative drug tests since entering the facility, had secured employment, had rented an apartment, and was engaged in programming to address his addiction and history of domestic violence. In his own testimony, Christopher added that he was looking for parenting classes and investigating day care possibilities. He proclaimed, "I just want to be able to have a chance to prove

---

[7] By mid-November, he had been granted parole, with a tentative discharge date in February 2022.

that I can do this. I was young and dumb in the past and I chose drugs over my kids and I'll never do that again."[8]

We commend Christopher's recent efforts to addressing his issues with substance abuse and domestic violence. Yet these first steps do not equate to "affirmatively assum[ing] the duties encompassed by the role of being a parent." Iowa Code § 600A.1(2). *Cf. In re D.M.*, 516 N.W.2d 888, 891 (Iowa 1994) (finding efforts "of very recent origin" to be an unpersuasive "eleventh hour attempt to prevent termination"). He needed to do more, even before C.W. was born. *See* Iowa Code § 600A.8(3)(c).

"The statute clearly expects a parent to assume the parental role when he learns he is the father of a baby." *In re R.L.H.*, No. 11-0760, 2012 WL 666741, at *2 (Iowa Ct. App. Feb. 29, 2012). Christopher knew Anna was pregnant for at least seven months before C.W. was born. In conversations with Anna, he never questioned that he was the father. Instead, he told her that he was happy about the pregnancy. Yet he continued to use methamphetamine and did not seek mental-health or substance-abuse treatment. *See id.* (finding clear and convincing evidence that father abandoned child within meaning of section 600A.8(3) when he was aware of pregnancy but did not show, through actions, a commitment to the child). Rather than supporting Anna during the pregnancy, Christopher continued to act aggressively and place her in fear. Through his erratic behavior, he also ended up in the hospital, and then in jail. On this record, we question

---

[8] The record shows that Christopher's parental rights had been terminated for two other children, now ages fourteen and seventeen.

Christopher's "fitness and ability" to assume custody of C.W. and his commitment to parenting. *See* Iowa Code § 600A.8(3)(a)(2).

On appeal, Christopher claims that Anna "thwarted" his efforts to build a relationship with C.W. He asserts that he tried to provide financial assistance, but Anna refused support. He also complains that she moved C.W. to a pre-adoptive placement out of state. We concur with the trial court's rejection of his claims:

> His financial and personal commitments are minimal. [Christopher] has taken no action to establish legal responsibility for the child prior to birth or subsequent to the child's birth. He has not sought to pay child support at any time nor contribute to placement expenses. He is not in a stable place in his life and does not have a meaningful support system established to prevent harm to this child.

In our de novo review, we find that legal guardian Buckmeier proved by clear and convincing evidence that Christopher abandoned C.W. under Iowa Code section 600A.8(3)(a)(1).[9] He did not support Anna emotionally or financially during the pregnancy. After C.W.'s birth, Christopher did not take prompt action to establish a parental relationship, waiting until after the originally scheduled termination hearing in October to arrange paternity testing. Neither did his actions show a commitment to C.W. By the time of the termination proceeding in November, Christopher had not achieved enough stability in his own life to provide a home for the child. We affirm the termination.

**AFFIRMED.**

---

[9] Because Christopher does not challenge the best-interests determination, we need not address it.